# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**THEODORE WILLIAMS,**

     **Plaintiff,**

**v.**
                                **Civil Action No.  5:04CV14**
                                  **(Judge Frederick P.  Stamp, Jr.)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

     **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Theodore Williams brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner" sometimes "Defendant") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I.  Procedural History

Theodore Williams ("Plaintiff") filed an application for SSI and DIB on April 30, 2001, alleging disability since June 26, 1998, due to stenosis of the spine and degenerative disc disease (R. 219-21, 261).[1]  The state agency denied Plaintiff's application initially and on reconsideration (R.

---

[1] Plaintiff filed prior applications, all of which were denied (R.  41-45, 172-78, 187-91, 477-81).  The last denial occurred by administrative hearing decision dated June 27, 2000 (R. 172-78).  These previous determinations were neither appealed nor reopened; therefore, the decisions are final and the evidence submitted, the findings made, and conclusions drawn are not

192-96, 198-200, 488-92, 495-97). Plaintiff requested a hearing, which Administrative Law Judge Randall W. Moon ("ALJ") held on July 26, 2002, in Wheeling, West Virginia., and at which Plaintiff, represented by counsel, Jonathan Bowman, and Eugene Czuczman, a vocational expert, testified (R. 498-558). On September 26, 2002, the ALJ entered a decision finding Plaintiff not disabled from his amended onset date of June 28, 2000, but that Plaintiff was entitled to benefits effective August 1, 2002, the date on which Plaintiff was considered an individual closely approaching advanced age (R. 17-27). Subsequent to the ALJ's finding, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-8).

## II. Statement of Facts

Plaintiff was born on December 22, 1952, and was forty-nine (49) years, nine (9) months old on the date of the ALJ's decision (R. 27-28, 219). He completed an eleventh-grade education, obtained a GED, attended community college, and obtained vocational training (R. 505, 510, 249). Plaintiff's past relevant work included laborer, janitor, and maintenance worker (R. 219, 243, 510). In June, 1998, Plaintiff sustained an injury to his back and ceased working (R. 219, 243).

On May 15, 2001, Plaintiff visited Northwood Health Services. He reported he felt "depressed because he [believed] the City of Wheeling [was] putting pressure on him to upgrade his home" and that he felt as if he was "being singled out." His mood was observed as depressed; his affect was noted as restricted. The therapist with whom Plaintiff met noted he "was resistant to the interventions . . . used to help him" and was "stuck in a pattern of agonizing and complaining" (R. 458).

_____

relevant to the instant case. _See_ Social Security Acquiescence Ruling (SSAR) 00-1(4), 65 Fed. Reg. 1936 (Jan. 12, 2000); 2000 WL 43664 (SSA). An unappealed denial of benefits at any level of the administrative process is final and binding on the parties. _See_ 20 C.F.R. §§ 494.905, .921, .955, .981 and 416.1405, .1421, .1455, .1481. The relevant evidence as to the instant case is after June 27, 2000, the date of the most recent final decision. The Plaintiff has amended his onset date to June 28, 2000 (R. 17).

On May 30, 2001, Plaintiff visited the Benwood Medical Clinic, Inc., for a follow-up examination by L. C. Kelly, D.O., relative to his lower back pain. Plaintiff stated he experienced numbness in his legs, which "comes & goes" and sharp, aching pain that radiated to both legs. Dr. Kelly assessed chronic low back pain and lumbar spinal stenosis. He refilled Plaintiff's prescription for Cyclobenzaprine, prescribed hydrocodone, and provided a sample of Viagra to Plaintiff (R. 429).

Fred J. Payne, M.D., whose neurosurgery practice was located in Wheeling, West Virginia, conducted an examination of Plaintiff and reported his findings in a June 12, 2001, letter addressed to the State of West Virginia, Disability Determination Section (R. 361-65). Plaintiff complained of "back pain with bilateral radiating leg pain and bilateral leg weakness" and "neck pain with right arm weakness" (R. 316). Dr. Payne noted the results of the x-ray taken of Plaintiff's lumbar spine on that date at Wheeling Hospital, located in Wheeling, West Virginia, which showed "narrowing of the L5-S1 disc space with arthritic spurring and degenerative end plate changes of the L5-S1 disc" (R. 363). Dr. Payne's examination of Plaintiff revealed no neck tenderness, no neck spasms, minimal restriction to left neck rotation, tenderness at the "lateral aspect of the right shoulder joint," no crepitus of either shoulder, no upper limb sensory loss, and bilateral arm weakness. Dr. Payne found "tenderness over the lumbosacral region," "paravertebral lumbar muscle spasm . . . worse on the right," and forward flexion to forty-five degrees. Plaintiff's motor examination "revealed Grade +4/5 bilateral hip flexion," bilateral knee extension was -4/5, bilateral knee flexion was normal, plantar flexion was 4/5 on the left, plantar flexion was +4/5 on the right, 4/5 dorsiflexion of left foot, normal dorsiflexion of right foot, straight leg raising in sitting position was 80-90 degrees on left and 70-80 on right, and supine straight leg raising was 15 degrees on left and 20 degrees on right. No sensory abnormalities were noted. Plaintiff could heel and toe walk normally, he could "squat down fairly easily," but he

3

needed "a chair to assist himself in getting up from a full squatting posture." Dr. Payne's diagnosis was for cervical degenerative disc disease with spondylosis and possible cervical radiculopathy (bilateral); right shoulder tendinitis; and lumbar degenerative disc disease with mild lumbar facet joint osteoarthritis (R. 364).

At the June 12, 2001, examination, Plaintiff informed Dr. Payne that his lower back pain was constant, his right foot became numb, and his leg weakness was bilateral. He stated the pain was "aggravated by doing any home maintenance." Plaintiff informed the doctor that he was "able to sit for only approximately ½ to one hour before experiencing further back pain" and that standing, climbing stairs, and walking aggravated his back pain. He stated he could drive for one-half to one hour before his back pain was aggravated. Plaintiff stated he was "limited with bending, lifting, carrying, . . . pushing and pulling" because of back pain. He asserted that he was "limited in taking out the garbage and very limited in the duration of time he can spend shopping for food." Plaintiff stated he could dress himself, but needed "assistance for getting out of a bathtub" (R. 362-63).

Dr. Payne offered the following opinion as to Plaintiff's condition:

There was no sensory loss noted on the examination . . . . There were no nerve root tension signs . . . . There was a marked discrepancy between straight leg raising in a sitting posture compared to that in a supine posture with both legs suggesting non organic pathology. The patient's motor loss did not follow a myotomal radicular distribution. No X Ray evidence has been submitted at this time to substantiate the motor weakness noted today as being due to a radiculopathy but the patient's very limited and painful range of lumbar motion was in keeping with his reported subjective limitation of activity . . . . However all of his reported activity limitations are centering only around the lumbar region with no mention of cervical or upper limb symptoms as being causally connected with functional impairment. I do not believe his motor weakness seen on exam has any causal connection with his limitations of activities of daily living since these are consistently reported to be limited by the patient as a result of pain (R. 365).

On July 9, 2001, Mary Anne Shoaff, a state agency physician, completed a residual functional

4

capacity (RFC) assessment of Plaintiff (R. 282-89). Dr. Shoaff found the following exertional limitations as to Plaintiff's physical abilities: 1) occasionally lift and/or carry twenty (20) pounds; 2) frequently lift and/or carry ten (10) pounds; 3) stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; 4) sit for a total of less than about six (6) hours in an eight (8) hour workday; and unlimited push and/or pull (R. 283). Dr. Shoaff determined Plaintiff's postural limitations were that he could occasionally climb, balance, stoop, kneel, crouch, and crawl (R. 284). Plaintiff was found to have no manipulative, visual, or communicative limitations, but it was found he should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 285-86). Dr. Shoaff determined Plaintiff's RFC should be reduced to "light" (R. 287).

Dr. Kelly conducted a medical examination of Plaintiff on July 20, 2001. Plaintiff stated he experienced lightheadedness, dizziness, and headache. Dr. Kelly noted Plaintiff demonstrated depressed mood and had "suicidal tendency/thought" three times per month. Dr. Kelly prescribed Paxil, refilled prescriptions for Cyclobenzaprine and hydorcodone. His assessment was for depression (R. 428).

On August 2, 2001, Plaintiff was involved in a motor vehicle accident, which resulted with his being treated at the Ohio Valley Medical Center, located in Wheeling, West Virginia. The emergency trauma record revealed that Plaintiff's neck was supple; he had no anterior cervical lymphadenopathy; Plaintiff demonstrated "no pain to palpation of the posterior cervical spine"; he had good range of motion in all extremities; there were "2+ distal pulses in all four extremities"; there was no cynosis, clubbing, or edema; Plaintiff did "have discomfort to palpation over the paralumbar musculature bilaterally"; there was "some pain to straight leg raising bilaterally";

Plaintiff had decreased strength due to pain in the lower extremities; and Plaintiff could move lower extremities "without much difficulty." The final diagnosis was for acute exacerbation of chronic low back pain and he was "given Demerol 50mg and Phenergan 25mg" for pain relief. He was instructed to "rest his back as much as possible" and "avoid any heavy lifting or exertion" (R. 426-27).

The x-ray taken of Plaintiff's lumbosacral spine on August 2, 2001, revealed "no evidence of acute fracture or malalignment." "Significant degenerative loss of disc height at the L5-S1 level with vacuum disc phenomenon" was observed. When the results of this x-ray were compared to the October 1, 1997, x-ray, "significant progression of degenerative process" was noted. There was "interval formation of anterior osteophytes at L5-S1 as well as development of significant sclerotic change within the inferior aspect of L5 and superior aspect of S1." Sacroiliac joints were normal. The impression was for "significant bony and disc degenerative changes with vacuum disc phenomenon at L5-S1 which has progressed compared to the prior exam of 10/1/97" (R. 434).

On August 17, 2001, Plaintiff returned to Dr. Kelly for a follow-up to his depression. He stated he was "sleeping a little," "eating good," "crying," and experiencing headaches. He requested an examination of his right knee because it had been swollen, inflexible, and painful. Dr. Kelly noted Plaintiff's mood and affect were "better." His assessment was for right knee effusion and depression (R. 425).

Plaintiff returned to Northwood Health Services on August 30, 2001, at which time his mood was noted as being "depressed" and his affect as "blunted." He stated he felt "stuck in the past" and that he was unable to "go out and play ball with his children which [caused] him to feel very bad." It was reported that Plaintiff was cooperative with the therapist and that he needed "individual therapy to assist him to improve emotional coping and problem solving in order to reduce symptoms of depression" (R. 378, 459).

On September 5, 2001, Plaintiff was examined by Samy F. Sakla, M.D., whose practice was with the Ohio Valley Pain Management Clinic, located in Wheeling, West Virginia. Plaintiff stated he had injured his back when he fell from a scaffold and the pain that resulted therefrom was "localized to the lower part of his back. . . ." Plaintiff described his pain as "constant" and "dull, achy and occasionally . . . sharp." Pain radiated "up through his spine" and "through both thighs to the knee level. . . ." Plaintiff stated the "tingling and numbness" he had felt had been "completely resolved since 1998 to this point." The pain, according to Plaintiff, was aggravated by "ambulation, sitting or standing" and "coughing and sneezing." Plaintiff informed Dr. Sakla that the pain medication "[eased] up his pain" and that his pain was a "5" on a scale of "0 to 10" (R. 368).

Dr. Sakla observed Plaintiff was "markedly tender in the L4-5 and L5-S1 level with a very strong positive jumping sign." There was no S1 joint tenderness, no CVA tenderness, no paravertebral muscle spasm, and no atrophy noted by the doctor (R. 369). Plaintiff's motor function was "well preserved in both lower extremities with no weakness." Sensation to pinprick and light touch were intact in lower extremities. Plaintiff's reflexes were "within normal limits in both knees," but "-2 in both ankles." The leg raising tests were positive in both lower extremities. Plaintiff's range of motion of "both knees and hips were well maintained bilaterally," but crepitus was evident in both knees. Dr. Sakla diagnosed chronic low back pain, which was secondary to degenerative disc and joint disease of the spine and spinal stenosis. He suggested an MRI for purposes of developing a treatment plan (R. 370).

On September 11, 2001, Plaintiff was treated at Northwood Health Services for depressed mood and restricted affect. He reported to the therapist that "his symptoms . . . remained the same since his last visit." Plaintiff stated he was "upset because he [was] being sanctioned by welfare

7

because he was not able to adapt to retraining at WVNCC." He stated that he was allotted "5 years to be retrained and re-enter the work force and has 1 year remaining" but that he deserved "more than 5 years assistance." Plaintiff was cooperative during the therapy session and the need for individual therapy sessions was again noted (R. 457).

An MRI was conducted of Plaintiff's lumbar region on September 18, 2001. Kelby L. Frame, M.D., interpreted the MRI and opined the following: 1) "acute or subacute disc herniation at L5-S1 causing mild spinal stenosis"; 2) "mild spinal canal narrowing at L3-4 and L4-5 due to broad based disc bulging"; 3) "degenerative facet disease at L3-4, L4-5 and L5-S1 level with hypertrophy of the facets and ligamentum flavum causing mild neural foraminal narrowing"; and 4) "increased marrow signal of T1 and T2 weighted sequences suggesting proteinaceous of fatty marrow process which can be seen with degenerative disc disease. This is more likely than a marrow replacement type of process such as metastatic disease" (R. 440).

On September 21, 2001, Plaintiff attended a therapy session at Northwood Health Services for depressed mood and restricted affect. He stated he continued "to feel depressed" but had "improved some because of the medication." He also stated he "was wooried [sic] about finances and [felt] pressure because of his family's needs." Plaintiff was cooperative during the therapy session (R. 456).

Also on September 21, 2001, a Psychiatric Evaluation of Plaintiff was completed by Steven L. Corder, M.D., of Northwood Health Systems (R. 372-77). Plaintiff informed Dr. Corder that he had been depressed, which caused him to feel helpless and hopeless, which had led him to begin contemplating suicide. The contemplation of suicide was, according to Plaintiff, caused by his "back problems, and limitations from this" (R. 372). Plaintiff also stated he had not had any current

8

thoughts or plans of suicide, but he instead decided to "'reach out and get some help." Plaintiff told Dr. Corder that he had "begun to see value in his life in spending time with his children" and that his "mood has increased some since he has been on medications." Plaintiff stated his primary problem was depression "since July of this year." Plaintiff complained of loss of energy, loss of interest, feelings of helplessness, feelings of hopelessness, loss of appetite, sleep continuity difficulties, crying spells, and loss of libido. Plaintiff denied episodes of hallucinations, associated fears, or delusions. Plaintiff also reported intervals of excess energy, wakefulness, and feeling "high," but did not report indulging in "spending sprees, impulsive travel," or "hyper religiosity or hyper sexuality" (R. 373).

Plaintiff did not report any previous psychiatric hospitalizations. Dr. Corder noted the medications prescribed by Dr. Kelly and which were being taken by Plaintiff (R. 374). Plaintiff informed Dr. Corder that he had gone "all the way through high school," had graduated from technical school, and had been trained as a brick layer. Plaintiff reported a history of alcohol abuse and drug use and his current alcohol and marijuana use. Plaintiff informed Dr. Corder that he had been charged three (3) times with driving under the influence previously and had been "sentenced to 90 days in jail." Plaintiff stated he "resumed drinking alcohol in June or July of 2001" (R. 375-76). Dr. Corder noted his observations as to Plaintiff's mental status as follows: Plaintiff 1) was well groomed and appropriately attired; 2) maintained eye contact; 3) spoke spontaneously, fluently, and copiously; 4) expounded on topics discussed and questions asked; 5) pursued explanations, details, and catharsis; 6) communicated in non-bizarre and non-delusional manner; 7) was not guarded or suspicious; and 8) had "no suicidal or homicidal ideas at all." Plaintiff described himself as "improving" (R. 375).

Dr. Corder found Plaintiff's "intellectual level was . . . near average," and he presented "no obvious cognitive defects." Plaintiff was well oriented with no "obvious difficulties with . . . concentration." Plaintiff's "affect was blunted to almost flat through most of the interview until the very end when he became much more animated, social, and pleasant, and even able to smile" (R. 376).

The Assessment/Diagnostic Impression of Plaintiff for Axis I was as follows: 1) major depression, recurrent, severe, without psychotic features (the "end of the interview suggested his difficulties are more moderate . . . . symptom description meets the criteria for severe"); 2) alcohol dependence, severe, but in partial remission; 3) cannabis abuse; and 4) narcotic use with denial of any abuse at this time. Axis II Assessment/Diagnostic Impression was deferred. The Axis III Assessment/Diagnostic Impression was for the following: 1) chronic pain due to spinal stenosis and protruding lumbar discs; 2) erectile dysfunction ("which is probably a combination of medical problem mentioned above, his alcohol use, and medications he is on"); physical limitations were noted for Axis III: and the Assessment/Diagnostic Impression for Axis IV was "45" (R. 376). Patient was instructed to return to Dr. Corder in one (1) week (R. 377).

On October 9, 2001, Plaintiff visited Dr. Kelly for a medical evaluation. Plaintiff stated he experienced headaches, dizziness, lightheadedness, pain in his lower back, and numbness in both legs. It was noted that Plaintiff needed a "referral." Dr. Kelly assessed chronic back pain, lumbar spinal stenosis, and depression. Dr. Kelly referred Plaintiff to Dr. Sakla (R. 439).

Plaintiff returned for therapy to Northwood Health Services on October 23, 2001, with depressed mood and restricted affect. He stated he continued "to feel depressed" and was concerned "about parenting his children" (R. 455).

10

On October 25, 2001, Thomas E. Andrews, Ph.D., a clinical psychologist, completed an "Adult Mental Profile" of Plaintiff. Dr. Andrews' general observations of Plaintiff included the following: 1) his "attitude and degree of cooperation with the entire evaluation was restrained"; 2) he "was generally a very slow-moving person and slow thinking"; 3) and he "acted and appeared as though he were many years older than his chronological age." Dr. Andrews opined that the result of these characteristics was that the "Performance IQ was probably artificially depressed" and the "Verbal IQ [was] somewhat questionable given his very slow response and mentation retardation" (R. 384).

Plaintiff stated he resided with his wife and four children and that the family received public assistance as its only source of income. Plaintiff informed Dr. Andrews that his symptoms were being "sleepy all the time," "things that should matter just don't," and "I feel like, 'What's the use?'" Plaintiff admitted to past and recent alcohol/drug use, which included consumption of one-half gallon of wine or more per day, and that he had been sober for six months (R. 385). Plaintiff stated he had "completed less than 12 grades of public school" and completed his GED in 1979 [approximate date], obtained computer technical training in 1973 or 1974, and "never learned to drive a vehicle." Dr. Andrews noted Plaintiff had been charged with driving under the influence three times, forgery, and "packaging with intent to deliver" (R. 386).

Dr. Andrews noted Plaintiff's behavior during the interview/testing to be cooperative, but "very slow in responding." Plaintiff's verbal responses were brief, and his eye contact, speech relevancy and coherency patterns, related manner, awareness of time, awareness of person, awareness of place, ideational output, thought content, perceptual functioning, and primary mood were normal. Plaintiff's "production, pace, and tone quality of speech were mildly impaired with

slow rate" and affect was flat (R. 387). The following observations of Plaintiff were made by Dr. Andrews: 1) insight as to awareness of life situations and problems was good; 2) judgment was mildly deficient; 3) "no significant signs of risk to self or others"; 4) immediate memory was moderately deficient; 5) recent memory was moderately deficient; 6) remote memory was mildly deficient; and 7) concentration was markedly deficient; 8) psychomotor function during examination appeared to be "mildly to moderately impaired as described under the section title Appearance (R. 388).

Plaintiff's intellectual assessment was rated by Dr. Andrews as follows: 1) Verbal IQ – 67; 2) Performance IQ – 73; 3) Full Scale IQ – 67; 4) Verbal Comprehension – 65; 5) Perceptual Organization – 76; and 6) Working Memory – 67 (R. 388). As to the internal validity of these assessments, Dr. Andrews opined that, "[b]ased upon the claimant's general effort, degree of cooperation, test taking attitude, ability to follow directions, and visual acuity, the results are considered to be invalid. This refers to all ability measures. . . . The results are depressed because of very slow reaction time and mentation." Additionally, the external validity of the assessment was noted to be invalid because Dr. Andrews considered "the nature and level of the claimant's education, vocational history, literacy level, and other capabilities." As to the WRAT-III assessment, Plaintiff achieved the following test scores: 1) Reading – Grade Level B5; 2) Spelling – Grade Level B4; and 3) Arithmetic – Grade Level <3. These test results were adjudged valid by Dr. Andrews (R. 389).

Dr. Andrews diagnosed the following: 1) Axis I – atypical depressive disorder and alcohol abuse in guarded remission; 2) Axis II – no diagnosis; and 3) Axis III – chronic pain by self report. Dr. Andrews found Plaintiff's prognosis to be "good." He also listed Plaintiff's daily activities as

12

rising at 8:30 a.m., attempting to eat breakfast so medication could be taken, attempting to assist his wife in household chores, napping because medication caused sleepiness, watching television, and tending to "mope around." Plaintiff stated he groomed himself, sat on the porch, and read once per day; watched television twice per day; and cleaned the house, washed the dishes, listened to the radio, and walked once per week (R. 390). Dr. Andrews observed Plaintiff's interacting with him "and staff members in a manner best described as mildly deficient with very slow physical and mental processing." Plaintiff informed Dr. Andrews that his social functioning was that he was "irritable around others." He had no contact with others, ate in restaurants once per month, visited others once per month, and engaged socially with primarily family members (R. 390-91).

Dr. Andrews made the following findings as to Plaintiff's deficiencies: 1) concentration/pace – moderately deficient; 2) persistence – mildly deficient; 3) pace – severely deficient; 4) immediate memory (MSE method) – moderately deficient; 5) recent memory (MSE method) – moderately deficient; 6) remote memory – moderately deficient; and 7) capability – would be able to manage finances; "however, the claimant has a recurrent alcohol problem and may not be reliable in this regard" (R. 391).

A state agency physician completed a Psychiatric Review Technique of Plaintiff on October 30, 2001 (R. 395-408). The physician noted the category upon which the medical disposition was based was affective disorders, specifically "atypical depression" (R. 398). No organic mental disorders; schizophrenic, paranoid, or other psychotic disorders; mental retardation; anxiety-related disorders; somatoform disorders; personality disorders; substance addiction disorders; or autistic or other pervasive developmental disorders were found (R. 395-404).

Additionally, the state agency physician completed a Mental Residual Functional Capacity

Assessment of Plaintiff on that same date (R. 419-22). The physician found Plaintiff's ability to remember locations and work-like procedures and ability to understand and remember very short and simple instructions was not significantly limited. Plaintiff's ability to understand and remember detailed instructions was found to be moderately limited. As to Plaintiff's sustained concentration and persistence, Plaintiff was found to not be significantly limited in his ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions. His ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and perform activities within a schedule, maintain regular attendance, and be punctual was found by the physician to be moderately limited. Plaintiff was found to have no limitations as to his ability to work in coordination with or proximity to others without being distracted by them (R. 419-20).

Plaintiff's social interaction was assessed as follows: 1) ability to interact appropriately with the general public and to ask simple questions or request assistance was not significantly limited; 2) ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness was moderately limited; and 3) ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was not limited. Plaintiff's adaptive abilities in the form of responding appropriately to changes in the work setting, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places and using public transportation, and setting realistic goals or making plans independent of others were not limited in any degree (R. 420).

The state agency physician concluded that Plaintiff could "follow routine 1 & 2 step instructions & perform routine ADL's" and that Plaintiff's "impairments do not result in a substantial reduction in his ability to function" (R. 421).

Also on October 30, 2001, a state agency physician completed a RFC assessment of Plaintiff (R. 410-16.) Hugh M. Brown, M.D., found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and unlimited push and/or pull (R. 411). Plaintiff was found to have no postural, manipulative, visual, communicative, or environmental limitations (R. 412-14).

On November 6, 2001, Plaintiff returned to therapy at Northwood Health Services for his depressed mood and restricted affect. He stated he continued to "feel depressed." The therapy session focused on Plaintiff's disagreement with the U.S. Post Office about the placement of his mail box at his residence, and the therapist noted Plaintiff "demonstrated the ability to problem solve rationally" relative to that disagreement. The therapist noted his intention to focus future therapy sessions on assisting Plaintiff in his effort "to improve emotional coping, problem solving, and parenting in order to reduce symptoms of depression" (R. 453).

Dr. Kelly examined Plaintiff on December 10, 2001, for complaints of numbness to his left foot, which had been present for three (3) months, swelling, pain, and immobility. Dr. Kelly noted Plaintiff could not extend his left toe (R. 438).

An electromyography was performed of Plaintiff on December 27, 2001, at Wheeling Hospital. Srini Govindan, M.D., was the interpreting physician. Dr. Govindan's determined there was "no evidence of radiculopathy" (R. 424).

15

On February 6, 2002, a notation was made on Plaintiff's Treatment Plan Review for Northwood Health Services that Plaintiff continued to be "non compliant with keeping scheduled TCM appointments, therefore progress in this area is unknown." A letter from Northwood Health Services inquiring as to Plaintiff's desire to continue therapy was mailed to him (R. 445). On May 8, 2002, Plaintiff did not maintain his appointment for a psychiatric evaluation at Northwood Health Services (R. 444).

Plaintiff returned to Dr. Kelly on May 24, 2002, with complaints of his legs "going out on him," numbness, swelling, and pain and a request for a cane for aide in ambulation. Dr. Kelly noted he would refer Plaintiff to physical therapy and he diagnosed spinal stenosis and acute stress reaction (R. 436).

The initial physical therapy evaluation of Plaintiff by Tadeusz Laska, a physical therapist with the Ohio Valley Medical Center Physical Therapy Department, on June 4, 2002, contained the following information as to Plaintiff's condition: 1) "pain in bilateral" lower extremities on May 3; 2) a "long history of rheumatoid arthritis"; and 3) pain that was "aggravated by ambulation decreased by sitting." The examination of Plaintiff by Therapist Laska revealed "MMT in bilateral LE's found strength rated as 4/5 bilaterally," "weakness of great toe extension in left foot," and ability "to perform 10 squats and 10 toe walking and heal walking." The treatment program included strengthening exercises for lower extremities, knee extensions, knee flexion, calf-strengthening exercises, calf-stretching exercises, leg presses, squats, and total gym exercises. Plaintiff was to attend physical therapy twice per week for four (4) weeks (R. 462).

On June 7, 2002, Plaintiff participated in physical therapy at Ohio Valley Medical Center. It was noted by Therapist Laska that Plaintiff was pleasant and cooperative. His warm-up exercise

on the stationary bicycle lasted five (5) minutes, and then his therapy continued on the "Strive" equipment, multihip machine, and "Total" gym. Plaintiff had no complaints during the treatment session, which lasted forty (40) minutes (R. 461).

On July 11, 2002, Plaintiff returned to physical therapy at Ohio Valley Medical Center, where he stated he was feeling stronger and was having less difficulty climbing stairs. Plaintiff was pleasant and cooperative. His warm-up exercise was for eight (8) minutes on the stationary bicycle, and he also used the "Strive" equipment, multihip machine, and "Total" gym. Plaintiff had no complaints during or about the therapy session, which lasted forty-three (43) minutes.

An MRI was conducted of Plaintiff's lumbar spine on June 11, 2002, at Ohio Valley Medical Center. It revealed "mild L3-4, L4-5 spinal stenosis and mild bilateral L3-4, L4-5, L5-S1 neural foraminal stenosis secondary to degenerative changes (R. 467).

On August 9, 2002, Dr. Kelly completed a Physical Residual Functional Capacity Questionnaire of Plaintiff. He noted the findings of the June 11, 2002, MRI. He listed Plaintiff's symptoms as "severe pain, low back, daily, walking makes it worse. Legs are weak, right worse than left" (R. 465). Dr. Kelly opined that Plaintiff's condition lasted or would last for twelve (12) months and that Plaintiff was not a malingerer. Depression and anxiety were emotional factors, according to Dr. Kelly, that contributed to the severity of Plaintiff's symptoms and functional limitations. Dr. Kelly noted Plaintiff was "very stressed at present" and was incapable of performing even low stress jobs (R. 469).

As to Plaintiff's abilities, Dr. Kelly opined Plaintiff could walk two (2) city blocks without rest or severe pain, could sit for fifteen (15) to twenty (20) minutes before he needed to stand, could stand for fifteen (15) to twenty (20) minutes before he needed to sit or walk, could sit and stand/walk

for less than two (2) hours in an eight (8) hour workday, should walk every fifteen (15) to twenty (20) minutes for four (4) to five (5) minutes in an eight (8) hour workday, would need to shift positions from sitting, standing or walking at will, would need to take unscheduled breaks for fifteen (15) to twenty (20) minutes in an eight (8) hour workday, and would require the use of a cane for ambulation. Dr. Kelly found Plaintiff did not need to elevate his legs during the course of an eight (8) hour workday (R. 469-70). Dr. Kelly also opined that Plaintiff could never lift and carry ten (10), twenty (20), or fifty (50) pounds, but could occasionally lift and carry less than ten (10) pounds. He found Plaintiff could never twist, crouch, or climb ladders but could rarely stoop and occasionally climb stairs. Dr. Kelly noted Plaintiff would have "good days" and "bad days" more than four (4) days per month (R. 471).

At the July 26, 2002, administrative hearing, Plaintiff testified that he attended school to the eleventh grade and attained his GED sometime in 1975 or 1977. Plaintiff also testified that he attended community college "two years ago" for one semester and that he had received training as a brick layer in 1975 or 1977 (R. 508-09). When asked by the ALJ why Plaintiff was not able to work, he responded, "Lack of concentration . . . and it's hard for me to remember things" (R. 515). He stated that once he left the administrative hearing, the "whole thing will be a blank to me" (R. 535). Plaintiff stated the Depakote and Paxil he was taking for his anxiety and depression did not remedy the symptoms (R. 515).

Plaintiff testified that the stenosis in his spine was the physical problem that prevented him from working because it caused him to experience constant pain in his lower spine (R. 518). He stated the pain medication he takes helped to relieve the pain "a little" and helped him to tolerate the pain (R. 519). Plaintiff testified that he refused surgery of the spine in 1998 and refused a "spinal

18

block" for relief of his back pain. The type of things Plaintiff did that caused pain to his back was sitting or standing for "a long period of time" or walking "a lot." Plaintiff defined "a long period of time" as fifteen (15) minutes. Plaintiff testified he could climb ten (10) steps before he would have to stop and rest (R. 521). Plaintiff stated he would be required to "rest at least two or three times" if he were to walk one (1) block. Plaintiff testified that he did not walk or perform any kind of physical exercise during the course of the day. He stated the doctor had instructed him as to a technique to relieve his back pain, which entailed his lying down in a "fetal position" (R. 522).

Plaintiff testified that he had undergone physical therapy to strengthen his legs, which had become "weak . . . from the pain" to the point that he would fall "over for no reason" when standing (R. 523). Plaintiff testified that the exercises at physical therapy made "the pain more intense." He stated that he would ride the "bicycle for like 10 minutes – 4 minutes into that I'm, I'm trying to get off the bike . . . to actually try and relieve the pain." Plaintiff testified he had stopped attending the physical therapy sessions. He stated he could not carry a bag of groceries or a gallon of milk; if he did carry a gallon of milk, he would feel as though "somebody took a rod and shoved it up my back (R. 525-26). Plaintiff testified that he had picked up nothing heavier than his shoes in the past thirty (30) days (R. 526). Plaintiff stated the physical therapist had provided different stretching exercises to him, but they did not help to relieve the pain (R. 532).

Plaintiff testified at the administrative hearing that his activities of daily living included reclining in a chair and watching television. Plaintiff informed the ALJ that he did not shop, perform household chores, or attend church. He testified that he had been enrolled in special education classes for two (2) years during high school because he had "problems keeping up with the regular classes . . . the regular students" in all subjects (R. 526-27). Plaintiff stated Dr. Kelly had

instructed him to walk as a form of exercise, but, because of the steps outside his residence, he could only "walk a little bit . . . to the restroom . . . my refrigerator . . . into the kitchen."

Plaintiff testified that he made an effort to be treated by a psychologist "two or three times a month" for his anxiety and depression. Plaintiff informed the ALJ that his conversations with the therapist were productive because it helped "to vent . . . to talk . . . to get out what's on my mind" (R. 533). Plaintiff stated his use of alcohol was consuming "a beer maybe once or twice . . . a month" (R. 534).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Moon made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. The claimant retains the residual functional capacity to perform a limited range of sedentary work. He must be able to get up and move around every 30 minutes, he is unable to stand or walk for two hours in an eight-hour

20

workday, and he is unable to sit for six hours in an eight-hour workday. He is limited to performing simple, routine tasks. The work should involve no more than minimal interaction with the general public and no more than occasional interaction with co-workers.

8.     The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9.     Born December 22, 1952, the claimant is a "younger individual age 45-49" (20 CFR §§ 404.1563 and 416.963). For the period beginning August 1, 2002, the claimant will be considered an individual "closely approaching advanced age."

10.    The claimant has a "high school equivalent education" (20 CFR §§ 404.1564 and 416.964).

11.    The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

12.    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 416.967),

13.    Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could have perform [sic] prior to August 1, 2002. Examples of such jobs include work as a type copy examiner with 850 jobs regionally and 90,000 jobs nationally, a patcher with 400 jobs regionally and 65,000 jobs nationally, and a document preparer for microfilming with 800 jobs regionally and 60,000 jobs nationally.

14.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through July 31, 2002 (20 CFR §§ 404.1520(f) and 416.920(f)).

15.    For the period beginning August 1, 2002, the claimant cannot make an adjustment to any work that exists in significant numbers in the national economy and a finding of disabled is reached within the framework of medical - vocational rule 201.14.

16.    The claimant's history of substance abuse is not a factor material to the finding of disability. Payments to the claimant may be made through a representative payee if the claimant is determined to be incapable of managing his funds.

21

17. There is evidence in the record indicating that the claimant has received worker's compensation payments since the alleged onset date.

18. The claimant has been under a disability, as defined in the Social Security Act, since August 1, 2002 (20 CFR §§ 404.1520(f) and 416.920(f)).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1. Medical evidence suggested Plaintiff met Medical Listing § 12.05C and Medical Listing § 12.05D, which the ALJ did not consider in his ruling;

2.      The ALJ's rejection of Dr. Kelly's RFC findings did not meet the requirements of SSR 96-2p; and

3.      The ALJ did not properly assess the extent of Plaintiff's complaints of pain according to 20 C.F.R. § 1529.

The Defendant contends:

1.      Substantial evidence supported the ALJ's determination that Plaintiff did not meet Listing §§ 12.05C or 12.05D.

2.      Substantial evidence supported the ALJ's evaluation of the medical evidence and opinions of record; and

3.      Substantial evidence supported the ALJ's determination regarding the credibility of Plaintiff's subjective complaints.

### C. Medical Listing §§ 12.05C and 12.05D

Plaintiff contends medical evidence suggested he met Medical Listing § 12.05C and Medical Listing § 12.05D, which the ALJ did not consider in his ruling. Defendant contends substantial evidence supported the ALJ's determination that Plaintiff did not meet Listing §§ 12.05C or 12.05D.

Listing § 12.05 for mental retardation is as follows:

[M]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C.      A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function;

     OR

D.      A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

The ALJ found the following relative to Plaintiff's meeting the criteria for Listing §§ 12.05C and 12.05D:

> On October 25, 2001, the claimant underwent a consultative psychological evaluation by Thomas E. Andrews, Ph.D. Results of the WAIS-III indicated a Verbal IQ of 67, a Performance IQ of 73, and a Full Scale IQ of 67. The examiner opined that the IQ scores were invalid both internally and externally. The claimant indicated restriction of activities of daily living primarily due to his physical impairments, but there was no indication that the claimant was no [sic] taking care of his personal needs. Similarly, the claimant was limited in his social activities, but he still interacted appropriately with the examiner and staff and indicated that he does spend some time with friends and relatives regularly. The examiner opined that the claimant was moderately deficient with concentration/pace, mildly deficient with persistence, severely deficient with pace . . . (R. 23).

> Based on the evidence of record relative to the claimant's mental impairment, along with the claimant's partially credible testimony, the Administrative Law Judge believes that the claimant's mental impairment causes no more than mild difficulties with his activities of daily living and social functioning, and no more than moderate difficulties maintaining concentration, persistence or pace. This is consistent with the opinions of a state agency medical consultant on October 30, 2001 (R. 24).

The language of Listing § 12.05C is clear and unambiguous; it requires that "the evidence demonstrates or supports onset of the impairment before age 22." The psychological evaluation of Plaintiff by Dr. Andrews was completed on October 25, 2001, when Plaintiff was forty-eight (48) years of age. Plaintiff did not meet the Listing for mental retardation because the evidence of record does not demonstrate or support onset of the impairment before age twenty-two. Plaintiff argues, in his brief, that the ALJ did not address the finding by Dr. Andrews that Plaintiff's demonstration

of "very limited educational attainment" was valid (Plaintiff's brief at p. 10). Educational attainment is not the criteria required for a finding that Plaintiff meets Listing §12.05C; the IQ rating (in combination with another mental or physical impairment) is the exclusive criteria for that section.

In addition to the October 25, 2001, IQ rating occurring when Plaintiff was forty-eight (48) years old and not at the prescribed twenty-two (22) years of age, the results of that evaluation were determined to be invalid by Dr. Andrews. The absence of these criterion constitutes substantial evidence, "relevant evidence as a reasonable mind might accept to support a conclusion," that Plaintiff did not meet the requirement for Listing § 12.05C, *Richardson, supra*. The ALJ considered that "the examiner opined that the IQ scores were invalid both internally and externally" (R. 23). The Plaintiff stated in his brief that "[n]o substantive explanation was offered by Dr. Andrews to explain the basis for the Plaintiff's so-called invalid IQ scores" (Plaintiff's brief at p. 10). The undersigned finds, after a thorough review of the evidence of record provided by Dr. Andrews, that he did state supporting reasons for his finding that Plaintiff's IQ evaluation were invalid. As to the internal validity of these assessments, Dr. Andrews opined that, "[b]ased upon the claimant's general effort, degree of cooperation, test taking attitude, ability to follow directions, and visual acuity, the results are considered to be invalid. This refers to all ability measures. . . . The results are depressed because of very slow reaction time and mentation." Additionally, the external validity of the assessment was noted to be invalid because Dr. Andrews considered "the nature and level of the claimant's education, vocational history, literacy level, and other capabilities" (R. 389). This detailed assessment led Dr. Andrews to find Plaintiff's "Performance IQ was probably artificially depressed" and the "Verbal IQ [was] somewhat questionable . . ." (R. 384). The undersigned finds the absence of a valid verbal, performance, or full scale IQ of 60 through 70 prior to the Plaintiff

25

attaining the age of 22 is substantial evidence which can, and does, support the ALJ's finding as to Plaintiff's not meeting the Listing.

The criteria in Listing 12.05D is dual. To meet that listing, an individual must provide "a valid verbal, performance, or full scale IQ of 60 through 70," resulting in at least two (2) of the following four (4) impairments listed being present: 1) marked restriction of activities of daily living; or 2) marked difficulties in maintaining social functioning; or 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. As noted above, Plaintiff did not provide a valid IQ rating for consideration by the ALJ; therefore, the first component of the criteria was not met. Further, the ALJ evaluated whether Plaintiff met the conditions of the second component of this dual criteria, and he found as follows: "the Administrative Law Judge believes that the claimant's mental impairment causes no more than mild difficulties with his activities of daily living and social functioning, and no more than moderate difficulties maintaining concentration, persistence or pace." The ALJ based this finding on his assessment of Plaintiff's credibility and the determinations made by the state agency physician in his October 30, 2001, evaluation of Plaintiff (R. 24). Additionally, the finding as to Plaintiff's activities of daily living, social functioning, concentration, persistence, or pace, and repeated episodes of decompensation by the ALJ are supported by the opinions of Dr. Andrews in that he did not find Plaintiff's IQ resulted "in at least two" of these factors. The evidence provided by Dr. Andrews as to Plaintiff's activities of daily living included his rising at 8:30 a.m., attempting to eat breakfast so medication could be taken, attempting to assist his wife in household chores; napping because medication caused sleepiness, watching television, and tending to "mope around." Plaintiff stated he groomed himself, sat on the porch, and read once per day; watched television twice per day; and

cleaned the house, washed the dishes, listened to the radio, and walked once per week (R. 390). As to Plaintiff's social functioning, Dr. Andrews found Plaintiff to be "mildly deficient"; concentration/pace was "moderately deficient"; persistence was "mildly deficient"; and pace was "severely deficient" (R. 390-91). Dr. Andrews made no determination as to episodes of decompensation by Plaintiff. The undersigned finds, therefore, the absence of a valid verbal, performance, or full scale IQ of 60 through 70, which resulted in limitations in at least two (2) out of four (4) abilities is substantial evidence which can, and does, support the ALJ's finding as to Plaintiff's not meeting the Listing.

Finally, the remaining medical evidence as to Plaintiff's mental impairment does not support a finding that Plaintiff met either Listing §§ 12.05C or 12.05D. As noted by the ALJ, Dr. Corder treated Plaintiff for depression, alcohol dependence, and cannabis use (R. 23). In evaluating Plaintiff, Dr. Corder found Plaintiff's "intellectual level was . . . near average," and he presented "no obvious cognitive defects." Plaintiff was well oriented with no "obvious difficulties with . . . concentration." Plaintiff's "affect was blunted to almost flat through most of the interview until the very end when he became much more animated, social, and pleasant, and even able to smile" (R. 376).

Dr. Kelly treated Plaintiff for depression. The ALJ noted Dr. Kelly's diagnosis of stress and his prescriptions of Depakote and Paxil to Plaintiff (R. 23, 24). Dr. Kelly did not conduct any mental evaluation to determine if Plaintiff met either criteria in Listing §§ 12.05 C and 12.05D. A state agency physician did, however, complete a Psychiatric Review Technique of Plaintiff on October 30, 2001 (R. 395-408). No organic mental disorders; schizophrenic, paranoid, or other psychotic disorders; mental retardation; anxiety-related disorders; somatoform disorders; personality

disorders; substance addiction disorders; or autistic or other pervasive developmental disorders were found (R. 395-404). Additionally, the state agency physician completed a Mental Residual Functional Capacity Assessment of Plaintiff on that same date. Plaintiff could, according to the assessment, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (R. 420). The state agency physician concluded that Plaintiff could "follow routine 1 & 2 step instructions & perform routine ADL's" and that Plaintiff's "impairments do not result in a substantial reduction in his ability to function" (R. 421). The evidence of record provided by Drs. Corder and Kelly and the state agency physician is substantial and supports the decision by the ALJ that Plaintiff did not meet either Listing § 12.05C or Listing § 12.05D.

For the reasons stated above, the undersigned finds the medical evidence does not suggest Plaintiff met Medical Listings § 12.05C and § 12.05D; the ALJ did properly consider the relative medical evidence in determining Plaintiff did not meet the criteria for Listing § 12.05C and § 12.05D; and substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing § 12.05C or § 12.05D.

### D. Weight to Treating Physician

Plaintiff contends that the ALJ's rejection of Dr. Kelly's RFC findings did not meet the requirements of SSR 96-2p. The Defendant contends substantial evidence supported the ALJ's evaluation of the medical evidence and opinions of record. The ALJ did consider and evaluate the findings of Dr. Kelly as to Plaintiff's condition as follows:

Dr. Kelly completed a . . . report on August 9, 2002, indicating a worsening of the claimant's physical impairment and a decrease in his residual functional capacity. The doctor opined that the claimant is unable to lift 10 pounds and able to lift less than 10 pounds only occasionally; he is never able to twist, crouch, climb ladders, and climb stairs; and he would miss work four days per month as a result of impairments. [Exhibit B18F] (R. 23).

As treating physician, Dr. Kelly's medical opinions certainly deserve a high degree of consideration. However, as discussed above, the Administrative Law Judge did not find the claimant's subjective complaints to be entirely credible. As Dr. Kelly's reports are based in large part on the claimant's subjective complaints of pain, the Administrative Law Judge does not assign controlling weight to the degree of limitations expressed by Dr. Kelly (R. 23).

SSR 96-2p provides, in part, the following:

Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

i.  The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

ii. The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

iii. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

iv. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is

inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

In *Craig v. Chater*, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

[4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The ALJ applied the standards of SSR 96-2p in that he recognized Dr. Kelly as Plaintiff's treating physician and this assessment of Plaintiff's condition was a "medical opinion;" however, the ALJ found Dr. Kelly's opinions were supported by Plaintiff's statements and not by "'medically acceptable' clinical and laboratory diagnostic techniques" and that his opinion was inconsistent with "other 'substantial evidence'" of Plaintiff's record. As mandated in *Craig, supra*, the ALJ could assign "significantly less weight" the treating physician's opinion when these two factors exist.

The medically acceptable clinical and laboratory diagnostic tests on which the ALJ relied to determine Plaintiff's RFC were 1) a June 12, 2001, x-ray of Plaintiff's lumbar spine, which showed some space narrowing, arthritic spurs and sclerosis at L5-S1 and moderate degenerative changes, but no fractures, spondylosis, or spondylolisthesis; 2) an August 2, 2001, x-ray of Plaintiff's lumbosacral spine, which showed bony and disc degenerative changes at L5-S1, but no acute fracture or misalignment; 3) a September 18, 2001, MRI of Plaintiff's lumbar spine, which showed mild spinal

stenosis, mild spinal canal narrowing, degenerative facet disease, mild neural foraminal narrowing, and degenerative disc disease; 4) a December 27, 2001, electromyography, which showed no evidence of radiculopathy; and 5) a June 11, 2002, MRI of Plaintiff's lumbar spine, which showed mild spinal stenosis and mild bilateral neural foraminal stenosis secondary to degenerative changes (R. 21-22). Dr. Kelly's records reveal that during Plaintiff's May 30, 2001, July 20, 2001, August 17, 2001, October 9, 2001, December 10, 2001, and May 24, 2002 evaluations, medications were prescribed and referrals to consultative physicians were made based on Plaintiff's statements about his condition and not on the results of the x-rays, MRI's, and electromyography (R. 425, 428, 429, 436, 438, 439). Dr. Kelly's opinion was not supported by clinical evidence, which defined Plaintiff's lumbar spine conditions as mild or moderate and not severe to the degree which would limit Plaintiff's exertional and nonexertional abilities as noted by Dr. Kelly (R. 468-71).

Additionally, the ALJ considered "other substantial evidence" as to Plaintiff's limitations with which Dr. Kelly's opinions were inconsistent. Dr. Payne performed a consultative examination of Plaintiff on June 12, 2001, which was considered and evaluated by the ALJ. The ALJ noted Plaintiff informed Dr. Payne that he could "sit for 30 to 60 minutes before experiencing further back pain"; experienced back pain when he climbed stairs or walked for five minutes; and could drive for thirty (30) to sixty (60) minutes. The ALJ also considered Dr. Payne's findings that Plaintiff "showed tenderness over the lumbosacral region with marked paravertebral lumbar muscle spasm"; demonstrated restricted range of motion; could perform sitting straight leg raising at "80-90 degrees left and 70-80 degrees right with increased lower back pain"; demonstrated supine straight leg raising to "15 degrees left and 20 degrees right with increased lower back pain"; presented no sensory abnormalities; and could heel and toe walk normally. Dr. Payne did note, as discussed by

31

the ALJ, that there was a "marked discrepancy between straight leg raising in a sitting posture compared to that in a supine posture with both legs, suggesting non-organic pathology." Dr. Payne diagnosed lumbar degenerative disc disease with mild lumbar facet joint osteoarthritis (R. 20-21).

The ALJ also considered the evidence of record of Dr. Sakla, who examined Plaintiff on September 5, 2001, on a referral by Dr. Kelly. The ALJ considered Dr. Sakla's observation that Plaintiff presented tenderness at L4-5 and L5-S1, with no spasm, his "[m]otor function was well preserved in both lower extremities with no weakness," and straight leg raising "was positive in both lower extremities." Dr. Sakla's diagnosed "chronic low back problem secondary to degenerative disc, joint disease, and spinal stenosis" (R. 21).

The opinions of Drs. Payne and Sakla constitute substantial evidence with which Dr. Kelly's opinion is inconsistent. Dr. Payne found Plaintiff could sit and/or drive for thirty (30) to sixty (60) minutes and Dr. Sakla found Plaintiff's motor function in the lower extremities was well preserved with no weakness, as noted by the ALJ. The record reveals that Dr. Payne found no sensory abnormalities and Plaintiff could heel and toe walk normally, he could "squat down fairly easily" (R. 364). Dr. Sakla found no S1 joint tenderness, no CVA tenderness, no paravertebral muscle spasm, and no atrophy (R. 369). The undersigned finds the ALJ conformed with the Regulation in not assigning controlling weight to Dr. Kelly's findings as to Plaintiff's limitations inasmuch as SSR 96-2p requires that all four requirements must be met in order for controlling weight to be assigned to the opinion of the treating physician; Dr. Kelly's opinion was not supported by medically acceptable clinical and laboratory diagnostic tests and was inconsistent with other substantial evidence.

The Plaintiff, in his brief, asserts that the ALJ "improperly" disregarded "the June 6, 2000, assessment" of Dr. Kelly "because it was dated twenty-one (21) days prior to the Plaintiff's previous

hearing decision of June 27, 2000" (Plaintiff's brief at p. 11). As to that opinion, the ALJ found the

following:

> There is a report dated June 6, 2000 from Dr. Kelly, a treating physician, wherein the doctor opined that the claimant could stand/walk only one hour in an eight-hour workday, and could sit only one hour in an eight-hour workday. The doctor stated that the claimant could lift only 10 pounds occasionally, could not use his feet for repetitive movements, and could only occasionally bend, squat, crawl, or climb. Dr. Kelly stated that the claimant had been disabled since his injury on June 25, 1998 due to spinal stenosis lumbar L3-S-1. [Exhibit 8F]. This evaluation was before the prior Administrative Law Judge decision and is not relevant to the present claim (R. 22-23).

The record contains the June 27, 2000, decision by Administrative Law Judge John W.

Taggart, in which a discussion and evaluation of Dr. Kelly's June 6, 2000, opinion is contained. It

reads as follows:

> Dr. Kelly completed a physical capacity evaluation, dated June 6, 2000, indicating that the claimant was capable of lifting up to ten pounds, standing and/or walking for one hour, and sitting for one hour in an eight hour work day. The doctor indicted that the claimant's diagnosis was spinal stenosis L3-S1. (Exhibit 8F) (R. 175).

> The undersigned finds that Dr. Kelly's assessment is overly restrictive in light of the diagnostic testing, the functional capacity evaluation, and the reports of Dr. Brown and Dr. Marquart. As Dr. Kelly's assessment is not consistent with other medical evidence in the record, it is not entitled to controlling weight (R. 176).

ALJ Taggart found Plaintiff was not disabled, and his decision was not appealed by Plaintiff (R.

178). This decision is the final decision relative to Plaintiff's disability as of June 27, 2000, and the

evidence, findings, and determinations therein are not relevant to the instant case. *See* Social

Security Acquiescence Ruling 00-1(4), 65 Fed. Reg. 1936 (Jan. 12, 2000). The Fourth Circuit

held, in *Albright v. Commissioner of Social Security*, 174 F. 3d, 476 (4th Cir. 1999), that the "SSA

treats a claimant's second or successive application for disability benefits as a claim apart from those

earlier filed, *at least to the extent that the most recent application alleges a previously unadjudicated*

*period of disability*" (emphasis added). Since the previous claim by Plaintiff, in which the June 6,

2000, opinion of Dr. Kelly was properly evaluated and considered, was adjudicated and not appealed, the ALJ in the instant case correctly evaluated and considered Dr. Kelly's June 6, 2000, opinion.

The undersigned, therefore, finds the ALJ did not err in his assessment of the treating physician's findings as mandated in SSR 96-2p and that substantial evidence exists in the record to support the ALJ's evaluation assignment of weight to the treating physician's opinions.

### E.  Plaintiff's Credibility as to Complaints of Pain

Plaintiff contends the ALJ did not properly assess the extent of Plaintiff's complaints of pain according to 20 C.F.R. § 1529; Defendant contends substantial evidence supported the ALJ's determination regarding the credibility of Plaintiff's subjective complaints.

20 CFR §404.1529 states:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence we mean medical signs and laboratory findings as defined in §404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or the symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

The ALJ found, in accordance with this Regulation, that Plaintiff had "medically determinable impairments that could reasonably be expected to cause some of the symptoms described, and the Administrative Law Judge believes the claimant does experience back pain, but not to the frequency and severity alleged" (R. 22). Based on this finding, the ALJ was required to make a determination about the Plaintiff's credibility relative to the intensity and persistence of pain suffered. In his decision, the ALJ considered the objective medical evidence, statements from treating and examining physicians, and Plaintiff's own statements.

The objective medical evidence which was reviewed by the ALJ included results of x-rays, MRI's, and an electromyography which showed moderate degenerative changes, mild spinal stenosis, mild spinal canal narrowing, degenerative facet disease, and mild neural foraminal narrowing (R. 21-22). The ALJ also considered the statements of treating and examining physicians as to Plaintiff's complaints of pain. Dr. Payne observed Plaintiff's "marked discrepancy between straight leg raising in a sitting posture compared to that in a supine posture with both legs, suggesting non-organic pathology" and noted there was "no x-ray evidence . . . to substantiate the motor weakness noted on examination" (R. 21). Dr. Sakla noted in his examination of Plaintiff that his "tingling and numbness throughout both lower extremities . . . had resolved in 1998" and "pain was aggravated by ambulation, sitting, and standing, and was eased by medication" (R. 21). The ALJ also evaluated the opinion of Dr. Kelly as to Plaintiff's limitations. He did "not assign controlling weight to the degree of limitations expressed by Dr. Kelly" because Dr. Kelly's "reports are based in large part on the claimant's subjective complaints of pain," which the ALJ found not entirely credible, and not by "the objective medical evidence of record" (R. 23-24).

The ALJ also evaluated Plaintiff's statements as follows:

35

The Administrative Law Judge did not find the claimant to be entirely credible based on some of his statements and the objective medical evidence of record. For example, the claimant testified that he attempted physical therapy and was forced to quit in part because was physically unable to perform the exercises such as riding the stationary bike. Yet physical therapy notes in the record indicate that the claimant had no complaints during treatment session of 40 or more minutes, including warming up on the stationary bike for eight minutes. . . . The claimant testified that he has not had a valid driver's license for 10 years because of a prior DUI, yet the record shows that he has driven on multiple occasions. The claimant testified to an almost complete inability to perform any type of movement due to back pain. However, on September 5, 2001, he rated his average daily back pain as only a level 5 on a scale of 0-10. The Administrative Law Judge believes the objective medical evidence of record shows a severe back impairment, but the evidence does not support a degree of almost total debilitation as alleged by the claimant. The claimant also testified that he seldom drinks since 1985, but yet he admitted during a psychiatric evaluation on September 21, 2001 that he still drinks and even smokes marijuana occasionally.

For the foregoing reasons, the Administrative Law Judge does not find the claimant to be entirely credible and does not fully accept his subjective statements concerning his symptoms and limitations (R. 22).

The ALJ, in his evaluation and consideration of Plaintiff's statements, revealed inconsistences in Plaintiff's testimony and the evidence of record regarding Plaintiff's participation in physical therapy, alcohol consumption, driving, drug use, and level of pain experienced. These inconsistencies, together with the medical evidence and opinions of medical professionals, are substantial evidence to support the ALJ's determination as to Plaintiff's credibility. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

The ALJ's credibility analysis was properly performed and his determination is given great weight. He effectively and correctly evaluated the objective medical evidence of record as to Plaintiff's impairments, the opinions of treating and examining physicians as to Plaintiff's

complaints of pain, and Plaintiff's testimony in determining his credibility. The undersigned, therefore, finds the ALJ did not err in his assessment of Plaintiff's complaints of pain in accordance with 20 C.F.R. § 1529 and that substantial evidence exists to support the ALJ's determination regarding Plaintiff's credibility as to his subjective complaints.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _2/_ day of June, 2005

_____

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE